IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ASARCO, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br><br>    vs.<br><br><br>NORANDA MINING, INC., a Delaware corporation,<br><br>    Defendant. | AMENDED[1] ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:12-CV-527-TC-DBP |

After Plaintiff Asarco, LLC (Asarco) emerged from bankruptcy in 2009, it filed this suit against Defendant Noranda Mining, Inc. (Noranda) to recoup a portion of $7.4 million it paid to the Environmental Protection Agency (EPA) for environmental cleanup of a former mining site near Park City, Utah ("Richardson Flat Site" or "Site").  Asarco relies on Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) to claim a right to payment (contribution) from Noranda.

Noranda asks the court to grant summary judgment on Asarco's claims because:

(1) Asarco lacks standing to seek contribution for cleanup of a portion of the site (the Lower Silver Creek Area) because it failed to preserve that contribution claim when it was discharged

---

[1]This Amended Order only changes the March 29, 2016 Order and Memorandum in two related respects.  Specifically, the incorrect date of "March 1, 2016," which appears in the text of page 31 and again in footnote 33 of the original order, has been corrected to read "March 1, 2006."

from bankruptcy; (2) Asarco is judicially estopped from recovering the $7.4 million because it convinced the Bankruptcy Court to accept Asarco's representation that $7.4 million was its fair share of response costs at the Site; (3) Noranda is statutorily protected from at least a portion of its alleged liability to Asarco because the EPA granted Noranda contribution protection through a partial consent decree under CERCLA; and (4) Asarco's claim fails as a matter of law under CERCLA because Asarco cannot establish that it paid more than its fair share of costs for cleanup at the Site.

For the reasons set forth below, the court finds that Asarco has standing to bring the entirety of its contribution claim, but that Noranda is entitled to summary judgment based on judicial estoppel, Noranda's contribution protection, and Asarco's inability to establish that it paid more than its fair share of costs at the Site.

## INTRODUCTION

"[T]he twin aims of CERCLA are to [clean up] hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination." Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005). One of the mechanisms to accomplish those goals is called a "CERCLA § 113 contribution action." Designed to "encourage private parties to assume the financial responsibility of cleanup," id., CERCLA Section 113 allows a party who has incurred cleanup costs at a hazardous waste site to be reimbursed for costs attributed to other responsible parties who have not participated in the cleanup. To collect money from those other responsible parties, the claimant (here, Asarco) must establish, among other things, that it has incurred more than its fair share of the response costs.

While in bankruptcy, Asarco paid $7.4 million to the EPA to assist with cleanup of the

Richardson Tailings Site.  Now out of bankruptcy, it is attempting to recover a portion of that

$7.4 million from Noranda, who, Asarco alleges, is responsible for much of the contamination.

Noranda has filed two motions for summary judgment.  First, Noranda asserts that Asarco

is judicially estopped from recovering any of the $7.4 million because Asarco told the

Bankruptcy Court that $7.4 million is a fair estimate of Asarco's liability at the site.  (See

Noranda's Mot. for Summ. J. based on Judicial Estoppel Grounds and Asarco LLC's Judicial

Admissions[2] ("Judicial Estoppel Motion").  Second, Noranda contends that Asarco, by its own

admission, paid its fair share of the response costs at the Site when it paid $7.4 million to the

EPA.  Those statements, along with a series of settlement agreements related to the Site, show

that Asarco may not recover any costs from Noranda.  (See Noranda's Mot. Summ. J. based on

Failure to State a Claim, Contribution Protection, and Lack of Standing[3] ("Contribution Motion")

at 1.)

The court agrees with Noranda and grants the motions.

## FACTUAL BACKGROUND

In 2005, Asarco filed for bankruptcy in the United States Bankruptcy Court for the

Southern District of Texas.  In 2006, the EPA filed a Proof of Claim against Asarco for $607,000

to cover cleanup costs at a portion of a mine tailings impoundment near Park City, Utah.  In

2008, the EPA filed a second Proof of Claim against Asarco seeking an additional $50 million

for cleanup of land downstream from the tailings impoundment.  Asarco settled these claims by

paying the EPA $7.4 million plus interest to resolve its liability at the mining site (the

[2]Docket No. 132.

[3]Docket No. 134.

Richardson Flat Site).

**The Richardson Flat Site**

Mining activities over the last century caused significant contamination of land and water at the Richardson Flat Site near Park City, Utah. The Site is divided into two parts:[4] (1) the Tailings Impoundment and (2) the Lower Silver Creek Area, downstream from the Tailings Impoundment.[5]

**The Tailings Impoundment**

The 160-acre Tailings Impoundment is located on a 650-acre property approximately one and a half miles north east of Park City, Utah. United Park City Mines (UPCM) owns the Tailings Impoundment, which includes a dam used to store tailings[6] from mining activities dating back to at least the early twentieth century. The Tailings Impoundment also includes diversion ditches and wetlands. In the EPA's documents, the Tailings Impoundment is referred to as "Operable Unit 1" or "OU1."

---

[4]The EPA has organized the contaminated area near Park City, Utah, into four operable units (OUs): OU1, OU2, OU3, and OU4. (See 2014 Admin. Order on Consent between United Park City Mines and EPA (2014 UPCM AOC) at Sections IV.12 and V.14, attached as Ex. 9 to the Contribution Motion.) OU1 is essentially another term for the Tailings Impoundment. OU1 refers to "an area covering approximately 258 acres, which acreage includes a tailings impoundment covering approximately 160 acres of land immediately southeast of the junction of U.S. Highway 40 and Utah Highway 248 in Summit County, Utah." (Id. Section IV.12.) Generally speaking, OU2 means the Lower Silver Creek Area. The EPA defines "OU2" as "an area bounded by Highway 40 on its southern end and Interstate 80 on its northern end" that is approximately 1,875 acres in size. (Id. Sections IV.12 and V.17.)

[5]The Site's physical boundary and related cleanup efforts have evolved over the years, as have the names used to designate the site. Because the parties present no genuine dispute of material fact regarding which properties are at issue here, the court has adopted terms that generally reflect the site in its current form.

[6]Tailings are a slurry made up of finely ground ore waste and water.

**The Lower Silver Creek Area**

The Lower Silver Creek Area was contaminated by large amounts of mine tailings that were discharged into Silver Creek and its tributaries by early mining and milling operations that began in the 1870s.  The Lower Silver Creek Area is downstream from the Tailings Impoundment.  It consists of 1,875 acres along Lower Silver Creek north and east of Highway 40 and is approximately 3.5 miles long, 600 to 800 feet wide, with a depth ranging from 30 inches to 8 feet.  In the EPA documents, the Lower Silver Creek Area is referred to as "Operable Unit 2" or "OU2."

**The Settlement Agreements Concerning Cleanup Costs at the Site**

To clean up the Site, the EPA has required potentially responsible parties (PRPs) to conduct cleanup activities or pay money to cover the costs of cleanup.  As part of that effort, the EPA entered into consent decrees with the PRPs, including agreements with Asarco, Noranda, and UPCM.  The individual PRPs also entered into their own settlement agreements addressing liability for contamination of the Site and granting releases of liability.

Those agreements are key to understanding whether Asarco can establish that it has paid more than its fair share of cleanup costs.  The centerpiece of those settlements is the 2009 EPA-Asarco Settlement.

**The 2009 EPA-Asarco Settlement**

On June 5, 2009, Asarco and the EPA entered into a settlement agreement during the bankruptcy proceedings ("2009 EPA-Asarco Settlement").[7]  As part of a larger global settlement,

---

[7]The 2009 EPA-Asarco Settlement is part of what is called the "2009 Miscellaneous Site Settlement," which is attached as Exhibit 14 to the Contribution Motion. The court refers to the

Asarco paid $7.4 million to the EPA to cover the Richardson Flat Site.[8]

> [T]his Settlement Agreement is intended to serve as a comprehensive settlement
> of the claims by the [federal and state] Governments against ASARCO with
> respect to all past costs and any potential future costs incurred by the
> Governments . . . relating to or in connection with the Miscellaneous Federal Sites
> [including the Richardson Flat Site].

(2009 EPA-Asarco Settlement at 5; see also id. Section I.1.f (defining "Miscellaneous Federal

Sites" to include the Richardson Flat Site).)  The EPA acknowledged that "the settlement

amounts herein [including the $7.4 million] are in the nature of compromises and these amounts

are lower than the Governments would claim in the absence of this settlement."  (Id. at 6

(emphasis added).)

    In exchange for Asarco's payment, the United States promised "not to sue or assert any

civil claims or causes of actions" under CERCLA sections 106 and 107.  (Id. Section VI.15.)

The United States also guaranteed contribution protection to Asarco for "matters addressed in

this Settlement Agreement includ[ing] all costs of response incurred or to be incurred by the

United States or any other person relating to or in connection with [the Richardson Flat Site]."

(Id. Section VIII.29 (emphasis added).)

    After reaching its global agreement with the EPA, Asarco filed a Motion to Approve

Settlement with the Bankruptcy Court.  (See Ex. 2 to Judicial Estoppel Motion; see also United

_____

Miscellaneous Site Settlement as a "global settlement."

    [8]See 2009 EPA-Asarco Settlement Section IV.8.a.vi. ("In settlement and full satisfaction
of all claims and causes of action of the United States on behalf of the Environmental Protection
Agency ('EPA') against [Asarco] with respect to any and all costs of response incurred, or to be
incurred, in connection with . . . the Richardson Flat Site. . . . EPA shall have an allowed general
unsecured claim in the total amount of $55,402,390, which shall be allocated as follows: . . .
Richardson Flat Site – $7.4 million[.]").

States Br. in Support of Asarco's Mot. to Approve Settlement, Ex. 4 to Judicial Estoppel Motion.)  Asarco filed the Declaration of Donald A. Robbins to support the motion.  (See Decl. of Donald A. Robbins in Support of [Asarco's] Motion Under Bankr. R. 9019 for Order Approving Settlement of Environmental Claims ("Robbins Decl."), Ex. 3 to Judicial Estoppel Motion.)

Donald Robbins was employed by Asarco for 44 years; during the last fourteen years of his tenure, he served as Asarco's Director of Environmental Services.  (Id. at p. 2, ¶ 2.)  At the time he signed his declaration, he was working as a consultant for Asarco.  (See, e.g., Robbins Decl. ¶¶ 4, 9, 12.)

Asarco contends that it is not bound by the statements of Mr. Robbins because he was not an employee of Asarco at the time he signed his declaration.  But Asarco submitted Mr. Robbins' declaration in support of its motion to approve the EPA settlement.  Mr. Robbins was working as a consultant for Asarco during the bankruptcy proceedings.   Under the circumstances, Mr. Robbins' statements are admissible under Federal Rule of Evidence 802(d)(2)(D) (a statement offered against an opposing party is admissible if it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed").  Mr. Robbins' statements are also admissible under Rule 801(d)(2)(B), which allows admission of a statement offered against opposing party if the party adopted the statement or believed the statement to be true. Rule 801(d)(2)(C) is another avenue for admissibility of a statement "made by a person whom the party authorized to make a statement on the subject."  By submitting Mr. Robbins' declaration in support of its motion for approval of the settlement, Asarco clearly authorized Mr. Robbins to make the statements concerning the settlement agreement and adopted the statements.

Asarco is bound by the position it took through Mr. Robbins' Declaration.

In his declaration, Mr. Robbins told the Bankruptcy Court that, "[d]uring the course of my career, I have developed a strong understanding of the issues related to the sites that are to be resolved through ASARCO's proposed settlement agreements."  (Robbins Decl. p. 2, ¶ 4.) Based on that understanding, he was "convinced that the Miscellaneous Federal and State Environmental Settlement Agreement [a part of which includes payment of $7.4 million for the Richardson Flat Site cleanup] is in the best interest of ASARCO's bankruptcy estate . . . ."  (Id. p. 1, ¶ 1.)  Mr. Robbins said his review of Asarco's expert technical report "further confirm[ed] that the proposed Environmental Settlement Agreements are in the best interest of ASARCO." (Id. p. 2, ¶ 4.)

Mr. Robbins said he supported the environmental settlement agreements because they allowed Asarco to resolve a potential environmental liability of over $3.6 billion for approximately $1.1 billion (he was speaking of all the contaminated sites addressed in the agreement, including the Richardson Flat Site).  (Id. p. 5, ¶ 10.)  He noted that the EPA originally sought $46.4 million in future remedial costs just for the Richardson Flat Site.  (Id. p. 11, ¶ 5.) Analyzing "whether ASARCO is paying its proportionate share at each site given the extent of its involvement at the site and the existence and viability of other potentially responsible parties (PRPs)," he concluded "that there is a reasonable linkage between the settlement reached and ASARCO's fair share of responsibility at all of these sites." (Id. p. 6, ¶ 11, and p. 7, ¶ 18 (emphasis added).)  He further declared that Asarco had, in the process of reaching settlements on the sites, "engaged technical consultants and legal counsel; developed a legal strategy; and attempted to either litigate or settle the claims against it within the CERCLA process."  Based on

8

that information, he was confident Asarco had "reached an overall settlement that is in line with its liabilities at these sites." (Id. p. 8, ¶ 19.)  Most importantly, Mr. Robbins concluded that Asarco understood that while there might be other PRPs associated with the Site, Asarco's settlement of $7.4 million "reflects only ASARCO's share of the response costs." (Id. p. 11 ¶ 5.)

The Bankruptcy Court held a two-day evidentiary hearing that addressed all of the sites in the global settlement.  After the hearing, Asarco submitted Proposed Findings of Fact and Conclusions of Law on its Motion to Approve Settlement.  (See Ex. 7 to Judicial Estoppel Motion.)  In those Proposed Findings of Fact and Conclusions of Law, Asarco stated that the settlement amounts for each of the uncontested environmental cleanup sites, including the Richardson Flat Site, "are within the range of estimates developed by [Asarco's] expert, Mr. [Brian G.] Hansen, and are generally well below the opposing estimates."  (Id. pp. 63-64, ¶ 178.) Asarco declared that "the proposed settlement amounts reflect significant compromises by the United States and state governments that are substantively fair because they are roughly correlated with [Asarco's] comparable fault, taking into account the litigation risks and additional factors described above."  (Id. p. 76, ¶ 211 (emphasis added).)

In June 2009, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law on Asarco's Motion to Approve Settlement ("Findings and Conclusions") (attached as Ex. 8 to Judicial Estoppel Motion).  The Bankruptcy Court adopted in substantial part the Proposed Findings and Conclusions submitted by Asarco.  In particular, the Bankruptcy Court approved the settlement of Asarco's Richardson Flat Site liabilities for $7.4 million.  (See id. 64-65, ¶¶ 179-81.)  The Bankruptcy Court cited to, among other evidence, Mr. Robbins' Declaration (id. pp. 64-65, ¶ 180), and said that "[t]he proposed settlement amounts reflect significant

compromises by the United States and state governments that are substantively fair because they are <u>roughly correlated with [Asarco's] comparable fault</u>, taking into account the litigation risks and additional factors described above."  (<u>Id.</u> p. 77, ¶ 214 (emphasis added).)  And the Bankruptcy Court stated that "the terms of the Settlement Agreements <u>bear a reasonable linkage</u> to ASARCO's responsibility for environmental contamination, taking into account the particular circumstances presented at each site addressed by the Settlement Agreements[.]"  (<u>Id.</u> p. 87, ¶ 243 (emphasis added).)

**Related Settlement Agreements**

Over the last few years, parties associated with the Site have entered into separate settlement agreements that are relevant to the issue before the court.  Some of the agreements were part of the bankruptcy proceeding while others were handled outside the bankruptcy proceeding.  The settlements, when read together, support the conclusion that Asarco does not have a viable contribution claim against Noranda.

<u>2006 Noranda Consent Decree</u>

In the summer of 2006, Noranda reached an agreement with the United States[9] to pay $60,000 to cover past cleanup costs associated with the Tailings Impoundment (the "2006 Noranda Consent Decree"[10]).  In exchange for the payment, the EPA gave contribution protection to Noranda for past response costs associated with the Tailings Impoundment:

> The Parties agree, and by entering this Consent Decree this Court finds, that
> Settling Defendants are entitled, as of the date of entry of this Consent Decree, to

---

[9]An entity called "Falconbridge" was also part of the agreement.  Falconbridge is not a party to this action.

[10]The 2006 Noranda Consent Decree is attached Ex. 21 to the Contribution Motion.

protection from 9613(f)(2) for "matters addressed" in this Consent Decree [i.e., Past Response Costs].

(Id. Section XI.21 (emphasis added).)  The Consent Decree defined "Past Response Costs" as "all costs, including but not limited to direct and indirect costs, that EPA or DOJ on behalf of EPA has paid at or [sic] in connection with the [Tailings Impoundment] through March 1, 2006 . . . ."  (Id. Section IV.3.j (emphasis added).)[11]

### 2007 UPCM Consent Decree

On October 4, 2007, UPCM and the United States entered into a settlement agreement addressing cleanup of the Tailings Impoundment (the "2007 UPCM Consent Decree"[12]).  (See 2007 UPCM Consent Decree Sections I.B, IV.4.)  That agreement requires UPCM to finance and carry out the remedial action at the Tailings Impoundment.  (Id. Section V.6 (emphasis added).)

UPCM received contribution protection from the EPA for matters addressed in the Consent Decree.  (Id. Section XXIII.93.)   Those matters included "Future Response Costs," which are defined as costs incurred by the United States at the Tailings Impoundment "on or after March 2, 2006."[13]  (Id. Section IV.4 (emphasis added).)

### The Private Settlements Between Asarco, Atlantic Richfield, and UPCM

In 2008, Asarco entered into a settlement agreement with Atlantic Richfield (AR)

---

[11]In addition, the United States promised not to sue Noranda "to recover Past Response Costs."  (2006 Noranda Consent Decree Section VII.13.)

[12]The 2007 UPCM Consent Decree is attached as Ex. 7 to the Contribution Motion.

[13]The EPA also promised that it would not sue UPCM for those costs.  (2007 UPCM Consent Decree Section XXI.80.)

(another PRP at the Site).  (See "2008 Asarco-AR Settlement"[14]).  In that settlement agreement, Asarco paid AR $1.45 million to cover a portion of cleanup costs at the Tailings Impoundment. Asarco and AR released each other from further liability.  (See id. Section IV.4.)  Asarco gave UPCM a similar release.  (Id. Section IV.5.)  Asarco's release of UPCM was conditioned on execution of another agreement between UPCM and AR, in which UPCM would release Asarco for all liability relating to the Tailings Impoundment.

That agreement between UPCM and AR (the one that was referred to in the 2008 Asarco-AR Settlement) was executed soon after Asarco and AR settled.  (See Settlement Agreement and Mutual Release ("2008 UPCM-AR Agreement")[15].)  The 2008 UPCM-AR Agreement concerned the Tailings Impoundment only.  (See id. Section IV.g.).

AR agreed to pay $ 2,350,000 to UPCM.  (Id. Section V.)  That $2.35 million included the $1.45 million that Asarco paid to AR.  (See id.)  AR was acting on its behalf as well as on Asarco's behalf.[16]  In exchange for payment, UPCM "forever discharged" Asarco "from any and all causes of action or claims arising from [the Tailings Impoundment] . . . ."  (Id. at Section IV.B.).  As noted above, Asarco released UPCM for liability at the Tailings Impoundment.  (See 2008 UPCM-AR Agreement Section VIII.A;  2008 Asarco-AR Settlement Section IV.6.)

### 2014 UPCM Administrative Order on Consent (AOC)

After Asarco filed this action, UPCM and the EPA entered into an Administrative Order

---

[14]The 2008 Asarco-AR Settlement is attached as Ex. 17 to the Contribution Motion.

[15]The 2008 UPCM-AR Agreement is attached as Ex. 17 to the Contribution Motion.

[16]AR was also acting on behalf of Park City Ventures (PCV).  Asarco and AR were partners in PCV.  PCV, another PRP, is not involved with the summary judgment issues before this court.

on Consent ("2014 UPCM AOC")[17] regarding the Lower Silver Creek Area.  That agreement

covers the remainder of the Richardson Flat Site, that is, the portion not addressed in the 2007

UPCM Consent Decree with the EPA (which relates to the Tailings Impoundment).  (Id. Section

IX.34 ("Nothing in this Settlement Agreement alters UPCM's obligations under the [2007

UPCM Consent Decree.").)  The 2014 UPCM AOC requires UPCM to clean up the Lower Silver

Creek Area (OU2).  (Id. Sections IV.12, IX.34, IX.36, XI.44.)

The United States granted contribution protection to UPCM for the Lower Silver Creek

Area (i.e.,  "matters relating to OU2, OU3, the Removal Action, the Work, the Natural Resource

Injury Assessment and Restoration Alternative Analyses, Future Response Costs[18], and Future

Assessment Costs.").  (Id. Section XXVII.114.)[19]  Money from Asarco's $7.4 million payment

was used for the cleanup.  Specifically, under the AOC, the EPA deposited six million dollars

($6,000,000) of the ASARCO Settlement Funds into the Richardson Flat Disbursement Account"

to make those funds "available for disbursement to UPCM as partial reimbursement for

performance of the Work under this Settlement Agreement."  (Id. Section XIX.79 (emphasis

added).)  The AOC defined "ASARCO Settlement Funds" as:

> funds recovered by EPA from ASARCO, LLC pursuant to the Amended
> Agreement Regarding Miscellaneous Federal and State Environmental Sites

---

[17]The 2014 UPCM AOC is attached as Ex. 9 to the Contribution Motion.

[18]"Future Response Costs" are defined as "all costs, including, but not limited to, direct and indirect costs, that EPA and BLM incur in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement."  (2014 UPCM AOC Section IV.12 (emphasis added).)

[19]The United States also issued a covenant not to sue UPCM concerning "the Work and Future Response Costs."  (UPCM AOC Section XXIII.105.a.i.)

approved by the U.S. Bankruptcy Court for the Southern District of Texas, Corpus
Christi Division, on June 5, 2009, resolving among other things the liability of
ASARCO, LLC for the Site [OU2 and OU3] and <u>deposited by EPA in the
Richardson Flat Special Account</u> . . . a portion of which will be used to . . .
finance or reimburse EPA for response actions at or in connection with the Site
[OU2 and OU3].

(<u>Id.</u> Section IV.12 (emphasis added).)

### **Asarco's Reservation of CERCLA Contribution Claims against other PRPs**

In preparation for discharge from bankruptcy, Asarco submitted a Disclosure Statement to

the Bankruptcy Court reserving claims that a reorganized Asarco could pursue after the

bankruptcy:

<u>all</u> rights and interests in action and/or claims against <u>potentially responsible
parties</u>, for indemnity and <u>contribution for environmental damages</u>, harm or
injury, which PRP claims have not been discharged or settled as of the Effective
Date.

(Disclosure Statement at 202.)[20]  Asarco submitted a proposed Plan of Reorganization that

included a similar reservation.

On November 13, 2009, the Bankruptcy Court, in its Confirmation Order,[21] confirmed the

Chapter 11 Plan of Reorganization[22] (the "Plan") for Asarco.  The Plan contains the same

reservation language in the Disclosure Statement, but also refers to an exhibit called the

"Schedule of Preserved Litigation Claims":

--------

[20]The Disclosure Statement is attached as Ex. 22 to the Contribution Motion.

[21]The Confirmation Order, Case No. 05-21207, Bankr. S.D. Tex., Docket No. 13203, is
attached as Ex. 23 to the Contribution Motion.

[22]<u>See</u> Seventh Am. Plan of Reorganization for the Debtors under Ch. 11 of the
Bankruptcy Code, as Modified on August 20, 2009, August 23, 2009, and August 27, 2009 (the
"Plan"), attached as Ex. 24 to the Contribution Motion.

Any and all claims and causes of action that were owned by ASARCO or its Estate as of the Effective Date, other than the Asbestos Insurance Actions, including, without limitation, for indemnity and contribution for environmental damages, harm or injury, which PRP claims have not been discharged or settled as of the Effective Date, shall vest in Reorganized ASARCO on the Effective Date, and Reorganized ASARCO shall be the only Entity entitled to pursue such claims or causes of action.   Attached hereto as **Parent's Plan Exhibit 9 is the Schedule of Preserved Litigation Claims** that shall vest in Reorganized ASARCO, which may be amended at any time prior to the Effective Date.

(Plan ¶ 10.13 (emphases in original and added).)

In the Schedule of Preserved Litigation Claims, Asarco used similar language, reserving the following:

PRP Claims – Reorganized ASARCO expressly reserves unto itself, its successors, heirs and assigns, all rights and interests in actions and/or claims against third parties ("potentially responsible parties" or "PRP"), for indemnity and contribution for environmental damages, harm or injury, which PRP claims have not been discharged or settled in this bankruptcy.

(Ex. 9 to the Plan at p. 3, Section 9 (emphasis added).)  Attached to the Schedule was a table that included the following:

| Name of Site | Lead Defendant |
|---|---|
| . . . . | |
| Richardson Flat | |
| . . . . | |

(Id. at p. 7.)

After the Bankruptcy Court approved the Plan, including the reservation of claims above, Asarco was discharged from bankruptcy.  Asarco then filed this suit against Noranda seeking a portion of the $7.4 million it paid for cleanup of the Richardson Flat Site.  Now Noranda seeks summary judgment on Asarco's contribution claim.

15

## ANALYSIS

Noranda filed two related motions for summary judgment: the Judicial Estoppel Motion and its Contribution Motion.

In the Judicial Estoppel Motion, Noranda asserts that "Asarco is judicially estopped from pursuing its contribution claim against Noranda because the position Asarco is taking in this case is clearly inconsistent with the position that it took and prevailed upon in its bankruptcy proceeding." (Judicial Estoppel Motion at 1.)  Alternatively, Noranda contends that Asarco made judicial admissions[23] in the bankruptcy proceeding that "prevent it from establishing an essential element of its Section 113 claim—that it paid more than its fair share of response costs for the site at issue in this case, the [Richardson Flat Site]."  (Id. at 1.)

In its Contribution Motion, Noranda presents three independent grounds to support its argument that, as a matter of law, Asarco does not have a valid claim against Noranda under CERCLA § 113.  First, Asarco's settlement with UPCM along with Asarco's representation to the Bankruptcy Court that the $7.4 million settlement with the EPA represented its share of cleanup costs, preclude Asarco's claim that it has paid more than its fair share of response costs at the Site.  Second, the portion of Asarco's claim related to the Tailings Impoundment is barred by contribution protection (immunity from liability) the EPA gave to Noranda in September 2006 for the Tailings Impoundment.  And third, Asarco lacks standing to bring its Lower Silver Creek Area cost recovery action because it did not preserve that claim before it was discharged from

---

[23]"Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."  U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005) (internal quotation omitted).

16

bankruptcy.

For the reasons set forth below, the court grants both motions.

A.      **Summary Judgment Standard**

Summary judgment is appropriate where there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets this initial burden, the burden then shifts to the nonmoving party "to set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To satisfy its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must go beyond the pleadings and identify specific facts that support each essential element of its case.  McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Here, the court need not consider the facts of site use, site history, or site contamination to determine Asarco's or Noranda's liability at the Richardson Flat Site.  The applicable legal standards, when applied to the undisputed settlement terms and representations by Asarco to the Bankruptcy Court, allow the court to rule on the motions as a matter of law.

**B.**     **Standing**

Noranda argues that Asarco does not have standing to pursue a claim for costs incurred at the Lower Silver Creek Area.[24]

The bankruptcy code allows a debtor, through its plan of reorganization, to retain and enforce "any claim or interest belonging to the debtor or to the estate" after the plan has been confirmed.  11 U.S.C. §§ 1123(b)(3)(A)–(B).  To do so, the reorganized debtor must <u>expressly preserve</u> the claim in the plan or it will not have standing to pursue the claim post-confirmation.  <u>Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)</u>, 540 F.3d 351, 355 (5th Cir. 2008) (emphasis added).[25]  "The reservation must be specific and unequivocal."[26]  <u>Id.</u> (internal citations and quotation marks omitted).

Because a Chapter 11 plan is a contract between a debtor and its creditors, the court will determine whether the reservation is specific and unequivocal by applying the principles of contract interpretation.  <u>Compton v. Anderson (In re MPF Holdings US, LLC)</u>, 701 F.3d 449, 457 (5th Cir. 2012).  The court may review the language in the Disclosure Statement as well as the Plan.  <u>Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)</u>, 714 F.3d 860, 864

---

[24]Noranda does not contend that Asarco lacks standing to bring a cause of action concerning the Tailings Impoundment.

[25]The parties agree that because Asarco filed for bankruptcy in the Southern District of Texas, Fifth Circuit law applies to the issue of whether Asarco has standing to bring this case.

[26]The purpose of this rule is to notify creditors of any claim the debtor wishes to pursue after confirmation.  "Proper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it—absent 'specific and unequivocal' retention language in the plan, creditors lack sufficient information regarding their benefits and potential liabilities to cast an intelligent vote."  <u>Dynasty Oil & Gas</u>, 540 F.3d at 355 (internal citation and quotation marks omitted).

18

(5th Cir. 2013).

Noranda contends that the language is not specific enough to reserve "Lower Silver Creek Area" in the Plan, even if extrinsic evidence is examined. As noted above, Asarco's Plan contains the following reservation language:[27]

> Any and all claims and causes of action that were owned by ASARCO or its Estate as of the Effective Date, other than the Asbestos Insurance Actions, including, without limitation, for indemnity and <u>contribution for environmental damages</u>, harm or injury, which PRP claims have not been discharged or settled as of the Effective Date, shall vest in Reorganized ASARCO on the Effective Date, and Reorganized ASARCO shall be the only Entity entitled to pursue such claims or causes of action. Attached hereto as **<u>Parent's Plan Exhibit 9 is the Schedule of Preserved Litigation Claims</u>** that shall vest in Reorganized ASARCO, which may be amended at any time prior to the Effective Date.

(Plan ¶ 10.13 (emphases in original and added).) That Schedule repeated the reservation language[28] and included a lengthy table specifying sites, including:

| Name of Site | Lead Defendant |
|---|---|
| . . . . | |
| Richardson Flat | |
| . . . . | |

(Ex. 9 to the Plan at p. 7.)

Noranda characterizes the reservation as a blanket reservation that forecloses Asarco's ability to pursue its Lower Silver Creek Area claim. According to Noranda, Asarco's reservation

---

[27]Asarco's Disclosure Statement contains very similar language.

[28]"<u>PRP Claims</u> – Reorganized ASARCO expressly reserves unto itself, its successors, heirs and assigns, <u>all</u> rights and interests in actions and/or claims <u>against third parties</u> ("potentially responsible parties" or "PRP"), <u>for</u> indemnity and <u>contribution for environmental damages</u>, harm or injury, which PRP claims have not been discharged or settled in this bankruptcy." (Ex. 9 to the Plan at p. 3, Section 9 (emphasis added).)

19

did not contain enough information to identify a CERCLA contribution cause of action for costs incurred at the Lower Silver Creek Area:

> Neither the Disclosure Statement nor the Plan provide the name of any potential defendant (including Noranda), the basis for any cause of action, whether Asarco intends to bring such causes of action, the potential value of any such causes of action, or any other information regarding any claim brought in this lawsuit. Fatally, the Plan does not define "Richardson Flat." Neither Lower Silver Creek nor the Tailings Impoundment are mentioned.

(Contribution Motion at 30.)

Noranda cites to Dynasty Oil & Gas, in which the court found that the reorganized debtor's plan contained a "blanket reservation" which deprived the reorganized debtor of standing. See Dynasty Oil & Gas, 540 F.3d at 356 (holding that a reorganized debtor had no standing because it made a "blanket reservation" when it reserved "any and all claims" without specifying the nature or basis of the claim). But that case is distinguishable on its facts. The plan in Dynasty Oil & Gas did not contain any language describing the common law claims the reorganized debtor wanted to pursue (i.e., fraud, breach of fiduciary duty, and negligence). The court found that "[n]either the Plan's blanket reservation of 'any and all claims' arising under the [Bankruptcy] Code, nor its specific reservation of other types of claims under various Code provisions are sufficient to preserve the common-law claims Dynasty now brings . . . ." Id. at 356.

Asarco's reservation is a categorical reservation. See, e.g., Compton, 701 F.3d at 455 (reservation of claims by category is permitted, and individual identification of prospective post-confirmation defendants is unnecessary); Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Texas Wyoming Drilling, Inc.), 647 F.3d 547, 549, 551-552 (5th Cir. 2011) (approving

preservation by category and noting that intended defendants need not be named in the plan);
<u>Dynasty Oil & Gas</u>, 540 F.3d at 355 (citing <u>In re: Ice Cream Liquidation, Inc.</u>, 319 B.R. 324,
337-38 (Bankr. D. Conn. 2005), approvingly for the proposition that categorical reservations are
sufficiently specific and that individual transfers need not be itemized)).

Although Asarco did not use language containing the term "CERCLA," the Plan uses
terms of art taken from CERCLA: it identified claims for "contribution for environmental
damages" which "PRP claims have not been discharged or settled as of the Effective Date" of the
Plan. (Plan ¶ 10.13.) The Plan also referred to a Schedule of Preserved Litigation Claims, which
used similar language. (<u>See</u> Ex. 9 to Plan at 3.) In a table incorporated into the Schedule, the
Plan specifically identified "Richardson Flat" as a site. (<u>See</u> <u>id.</u> at 7.)

Noranda contends that the reservation does not include the Lower Silver Creek Area
because the term "Richardson Flat" is not defined or used anywhere in the Disclosure Statement,
the Plan, or the Confirmation Order. "Within the four corners of the Plan document, there is no
way to find that Asarco intended to preserve a claim against Noranda with regard to Lower Silver
Creek." (Contribution Motion at 38.) Noranda characterizes that as an ambiguity[29] and relies on
extrinsic evidence to show that the term "Richardson Flat" was intended to mean only the

---

[29]Noranda asserts that any ambiguity in the Plan must be construed against Asarco.
(Contribution Motion at 39 (arguing that ambiguities must be construed against the party drafting
the document (that is, the "party who caused the uncertainty to exist").) As Asarco points out,
any alleged ambiguity in a preservation of claims is not automatically interpreted against the
debtor. <u>See, e.g.</u>, <u>Compton</u>, 701 F.3d at 456; <u>Lovett v. Cardinal Health, Inc. (In re Diabetes
Am., Inc.)</u>, 485 B.R. 340, 346 (Bankr. S.D. Tex. 2012) ("Ambiguity does not render a reservation
invalid per se"). Moreover, the Fifth Circuit has approved the use of parol evidence to examine
ambiguous reservation language in a claim reservation; this indicates that there is no rule in the
Fifth Circuit that any ambiguity in reservation language renders the reservation invalid. <u>See</u>
<u>Compton</u>, 701 F.3d at 456.

Tailings Impoundment.  (See id. at 38-39.)  Looking outside the Plan, Noranda cites to anecdotal examples of two people characterizing the locations as encompassing only the Tailings Impoundment.  (Id.)

Those informal descriptions by the two people cited by Noranda are rebutted by more definitive characterizations of the Richardson Flat Site.  For instance, the 2008 EPA-Asarco Settlement defines "Richardson Flat Site" to include the Tailings Impoundment and the Lower Silver Creek Area.  Although it is true that, at one time, the Tailings Impoundment and the Lower Silver Creek Area were separate sites established by the EPA, in 2008, because the two sites were so intertwined, the EPA changed the designation and included the Lower Silver Creek Area in the Richardson Flat Site.  The reorganization and re-naming of the Site occurred before the Plan was confirmed in 2009.

In short, the record definitively establishes that the Richardson Flat Site listed in the Schedule of Preserved Litigation Claims included both the Tailings Impoundment and the Lower Silver Creek Area.  Asarco properly preserved its PRP environmental contribution claims against Noranda and has standing to bring a contribution claim for the entire Site.

**C.    Section 113 Contribution Claim under CERCLA**

To prevail on its CERCLA § 113(f) claim for contribution against Noranda, Asarco must establish not only that Noranda contributed to the release of a hazardous substance at the Site[30]

_____

[30]Specifically, Asarco must establish that: (1) the Site is a "facility" as defined by CERCLA; (2) a release or threatened release of a hazardous substance occurred at the Site; (3) the release or threatened release caused Asarco to incur necessary response costs consistent with the National Contingency Plan (NCP); and (4) Noranda falls within a class of responsible parties described in CERCLA § 107(a).  See Young v. United States, 394 F.3d 858, 862 (10th Cir. 2005) (setting forth elements of a CERCLA Section 107(a) action); Sun Co., Inc. (R&M) v.

but also that Asarco paid more than its fair share of response costs to clean up the Site.  In other words, CERCLA "allows a 'non-innocent' party (i.e., a party who himself is liable) only to seek recoupment of that portion of his expenditures which exceeds his pro rata share of the overall liability. . . ."  United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 100 (1st Cir. 1994) (emphasis added); see also Sun Co., Inc. (R&M) v. Browning-Ferris, Inc., 124 F.3d 1187, 1194 (10th Cir. 1997) ("PRPs who have contributed to the waste at a site may recover from other PRPs that portion of their cleanup costs which exceeds their pro rata share.") (emphasis added).

In a contribution case, the court would usually review evidence of actual cleanup costs associated with the site, determines each party's pro rata share of those costs based on site history, and, most importantly, determines whether a party's payment exceeded its personal responsibility—that is, whether the party paid more than its fair (pro rata) share of the response costs.  But here, given Asarco's representation to the Bankruptcy Court (i.e., that its payment of the $7.4 million was its share of the liability for cleanup costs), Asarco is judicially estopped from bringing its claim.  Also, Asarco's statements, along with the undisputed terms of various settlement agreements concerning the Richardson Flat Site, the contractual releases granted by other PRPs, and the immunity (contribution protection) the United States granted to Asarco and other PRPs, show that Asarco cannot, as a matter of law, establish that it paid more than its fair share of response costs for the Site.

### 1.     Asarco is judicially estopped from bringing its CERCLA contribution claim.

Noranda argues that Asarco is judicially estopped from bringing its contribution claim

---

Browning-Ferris, Inc., 124 F.3d 1187, 1191 (10th Cir. 1997) (Section 113 of CERCLA incorporates the liability provisions of CERCLA Section 107).

against Noranda.  According to Noranda, Asarco should not be allowed to take a position in this litigation that is clearly inconsistent with its position in bankruptcy proceedings regarding the Richardson Flat Site.  Specifically, Noranda point to Asarco's representations to the Bankruptcy Court that the $7.4 million was essentially Asarco's share of liability at the Richardson Flat Site.

The court may, in its discretion, apply the equitable doctrine of judicial estoppel to prevent the "improper use of judicial machinery" and to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (internal citations and quotation marks omitted).  When determining whether to apply the doctrine, the court considers three factors: (1) whether the party's position in the litigation is clearly inconsistent with a position it took in earlier litigation, (2) whether the party persuaded a court to accept that party's former position so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party asserting the inconsistent position would gain an unfair advantage in the litigation if not estopped.  Eastman v. Union Pac. R.R. Co., 493 F.3d 1151, 1156 (10th Cir. 2007).

The Tenth Circuit applies the doctrine "narrowly and cautiously."  Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1227 (10th Cir. 2011) (internal citation omitted).

> Our rationale behind our cautious application of the doctrine is that judicial estoppel is a powerful weapon to employ against a party seeking to vindicate its rights, and there are often lesser weapons that can keep alleged inconsistent statements in check while preserving a party's option to have its day in court. . . . The most obvious of these lesser remedies is to allow the opposing party to impeach at trial the party that has made the inconsistent statement.  Judicial estoppel is only appropriate when that technique or other less forceful remedies are inadequate to protect the integrity of the judicial system.

<u>Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.</u>, 767 F.3d 987, 993 (10th Cir. 2014) (internal

citation omitted) (emphasis added).  Keeping that narrow standard in mind, the court

nevertheless finds that judicial estoppel here is necessary "to protect the integrity of the judicial

system."  <u>Id.</u>

> **a.    Asarco's position here is clearly inconsistent with the position it took during the bankruptcy proceedings.**

> **i.    <u>Position Taken in the Bankruptcy Proceedings</u>**

In the bankruptcy proceedings, Asarco essentially told the Bankruptcy Court that $7.4

million was its fair share of liability for cleanup of the Richardson Flat Site.  To support its

position, Asarco represented to the court that it was not overpaying for the settlement and that it

was not paying for response costs attributable to other PRPs.  It accomplished this in large part

by submitting the declaration of Donald Robbins.  (<u>See</u> discussion of the 2009 EPA-Asarco

Settlement, <u>supra</u>.)

> **ii.    <u>Position Taken Here</u>**

In stark contrast to its position above, Asarco represents to this court in its Second

Amended Complaint that Asarco's $7.4 million settlement exceeded Asarco's share of response

costs for the Richardson Flat Site.  In its complaint, Asarco alleges the following:

> This is a civil action brought by Asarco pursuant to CERCLA for contribution against [Noranda] for costs incurred by Asarco at the [Richardson Flat Site] ("the Site") in Summit County, Utah.  Asarco has recently paid over $8.7 million [$7.4 million plus interest] to settle all of its CERCLA-related liability at the Site.  These Settlements <u>included costs to cleanup and control contamination that cannot be associated with Asarco's historic mining activities, but can only have come from [Noranda's] facilities.</u>

(Second Am. Compl. ¶ 1, Docket No. 58 (emphasis added).)

> To date, Asarco has incurred approximately $8,707,455.57 for response action consistent with the NCP pursuant to 42 U.S.C.  This amount consists of $7.4 million in principal, plus $1,307,455.57 in interest. § 9607(a)(4)(B).  <u>This amount represents more than [Asarco's] allocable share of costs related to its releases or disposal of hazardous substances in the Site.</u>

(<u>Id.</u> ¶ 30 (emphasis added).)  And in its initial disclosures, Asarco more specifically asserts that it "seeks contribution from Noranda under CERCLA to recover the portion of funds it paid in the settlement and judgment <u>in excess of its proportionate share</u> [that is, approximately $2.4 million]."  (Asarco's Initial Disclosures Pursuant to Fed. R. Civ. P. Rule [*sic*] 26 at 6, Ex. 6 to Judicial Estoppel Motion (emphasis added).)

Asarco told the Bankruptcy Court that its fair share of liability at the Site was $7.4 million, which was reflected in the settlement with the EPA.  Asarco now claims that its fair share of liability at the Site was actually no more than $5 million and that it overpaid approximately $2.4 million in its settlement with the EPA.  These two positions are clearly inconsistent.

### b. This court's acceptance of Asarco's position would create the perception that either this court or the Bankruptcy Court was misled.

Asarco persuaded the Bankruptcy Court to accept its former position that the $7.4 million represented Asarco's fair share of liability at the Site.

On June 5, 2009, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law on Asarco's Motion to Approve Settlement ("Findings and Conclusions") (attached as Ex. 8 to Judicial Estoppel Motion).  The Bankruptcy Court's Findings and Conclusions adopted in substantial part Asarco's Proposed Findings and Conclusions in which Asarco stated that it was only paying its share of liability.  The Bankruptcy Court approved the proposed settlement.

According to Asarco, Noranda has not established this second element because the Bankruptcy Court did not adjudicate the issue of whether $7.4 million was indeed Asarco's liability at the Site.  Asarco points out that the Bankruptcy Court was determining whether the settlements, including the Richardson Flat Site settlement, were fair and equitable under Federal Rule of Bankruptcy Procedure 9019.  And that, Asarco says, fundamentally differs from what the court must do in a CERCLA contribution action.

> Rule 9019 requires only that a settlement be "fair and equitable," considering: (i) the probability of success in the litigation; (ii) the complexity and likely duration of the litigation, including attendant expense, inconvenience and delay; and (iii) all other factors bearing on the wisdom of the settlement, including (a) the interest of creditors, and (b) whether the settlement is the product of arms-length bargaining. (See Noranda Ex. 2, at 9, ¶¶ 19, 20 (citing multiple cases).) The approval of a settlement in bankruptcy under Rule 9019 is not the result of the adjudication of a disputed issue, and it does not rely on determinations of factual issues in regard thereto. See, e.g., Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) ("In undertaking an examination of the settlement, we emphasize that this responsibility of the bankruptcy judge, and ours upon review, is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." (quotation marks and citation omitted)). Otherwise, there would be no point in settling. See Martin v. Cox (In re Martin), 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) ("[I]t is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement.").

(Opp'n to Judicial Estoppel Motion at iv n.6, Docket No. 139.)

Judicial estoppel does not require adjudication of the factual issue.  See, e.g., FCC v. Airadigm Commnc'ns, Inc. (In re Airadigm Commc'ns, Inc.), 616 F.3d 642, 662 (7th Cir. 2010) (explaining that "theories of judicial estoppel draw from the fact of inconsistency rather that the fact of adjudication") (citing Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 18B

27

Federal Practice & Procedure § 4477, at 552 (2d ed. 2002)).  "What matters for purposes of judicial estoppel is whether, in reaching its earlier decision, the court relied on the representation of the one against whom estoppel is asserted."  Id.  The judicial estoppel doctrine "is designed to protect the integrity of the courts rather than any interest of the litigants."  Id. (citing Lowery v. Stovall, 92 F.3d 219, 223 n.3 (4th Cir. 1996)).

The fact that the Bankruptcy Court was approving a settlement rather than making a judicial determination on the merits does not change the court's analysis.  Courts apply judicial estoppel to positions advanced, and ultimately accepted, as part of court-approved settlements. See, e.g., Carnegie v. Household Int'l, Inc., 376 F.3d 656, 660 (7th Cir. 2004) (applying judicial estoppel to class action settlement approved under Rule 23 of the Federal Rules of Civil Procedure and noting that, regardless of the nature of the case, "'a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground.'") (internal citation omitted); Reynolds v. Comm'r Internal Revenue, 861 F.2d 469, 471-73 (6th Cir. 1988) (stipulation of settlement in bankruptcy proceeding under Rule 9019 was "court approved compromise" that subsequent court properly used to apply the judicial estoppel doctrine).

> The "prior success" requirement [of the judicial estoppel doctrine] does not mean that the party against whom the judicial estoppel doctrine is to invoked must have prevailed on the merits. Rather, judicial acceptance means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.

Reynolds, 861 F.2d at 473 (internal quotation marks and citation omitted) (emphasis added).

Indeed, the fact that the settlement was approved in a bankruptcy proceeding rather than in a civil setting strengthens Noranda's judicial estoppel argument.

When an ordinary civil case is settled, there is no "judicial acceptance" of

28

> anyone's position and thus there can be no judicial estoppel in a later proceeding.
> But when a bankruptcy court—which must protect the interests of all
> creditors—approves a payment from the bankruptcy estate on the basis of a
> party's assertion of a given position, that, in our view, is <u>sufficient "judicial
> acceptance"</u> to estop the party from later advancing an inconsistent position.

<u>Id.</u> (emphasis added).  Compromises between the debtor and its creditors must be approved by

the bankruptcy court under Rule 9019.  The rule imposes "an affirmative obligation [on the

bankruptcy court] to apprise itself of the underlying facts and to make an independent judgment

as to whether the compromise is fair and equitable."  <u>Id.</u>  Given this process, a bankruptcy court's

approval of a settlement under Rule 9019 is "sufficient 'judicial acceptance' to estop the party

from later advancing an inconsistent position."  <u>Id.</u>; <u>see also, e.g.</u>, <u>Warda v. Comm'r of Internal

Revenue</u>, 15 F.3d 533, 538-39 (6th Cir. 1994) (analogizing decision of a probate court to

decision of a bankruptcy court, and noting that "the approval of a settlement satisfies the judicial

acceptance requirement when the court is obliged to ensure that the settlement is fair and

equitable and when the court cannot discharge its duties by acting as 'a mere rubber stamp.'")

(quoting <u>Reynolds</u>, 861 F.3d at 473).

   Here, the record shows that the Bankruptcy Court, in its Findings of Fact and Conclusions

of Law, relied on and accepted Asarco's position that the settlement amount reflected Asarco's

fault at the Site.  In its motion for approval of the settlement, Asarco submitted the Robbins

Declaration.  Asarco noted the discrepancy between its financial exposure at the Site (between

$25.1 million and $46 million)[31] and the proposed settlement amount of $7.4 million.  Mr.

Robbins, on Asarco's behalf, assured the court that there were other PRPs and that the $7.4

_____

[31]Robbins Decl. ¶ 5.

million represented only Asarco's share of the response costs.  This representation formed the Bankruptcy Court's basis for finding that the value of the claim against Asarco and the settlement amount were reasonably equivalent.[32]

Because Asarco obtained judicial approval of the 2009 EPA-Asarco Settlement in the situation described above, any ruling by this court that all or even a portion of the $7.4 million did <u>not</u> constitute Asarco's liability for costs at the Site would create the perception that either this court or the Bankruptcy Court was misled by Asarco.  Accordingly, the court finds that Noranda has established the second element of the judicial estoppel test.

3.      **Asarco would gain an unfair advantage if it were allowed to pursue its contribution action against Noranda.**

Allowing Asarco to change its position in this case would give it an unfair advantage.  By convincing the Bankruptcy Court that the $7.4 million represented Asarco's fair share for cleanup costs at the Site, Asarco received a release from past and future response costs at the Site, a release from any obligation to do cleanup work at the Site, and protection from contribution claims by other PRPs (such as UPCM) relating to the Site.  All of this was granted despite the United States' calculation that Asarco's potential liability exceeded $46 million.

As Noranda notes, "If Asarco were to prevail in this case, it will have successfully used the bankruptcy process to discharge its substantial liabilities based upon its representations there and it will have used this Court to recoup liabilities that it told the Bankruptcy Court were for its fair share.  That is exactly the type of unfair advantage the judicial estoppel doctrine is intended

---

[32]The United States made a similar representation that the settlement amounts, including the $7.4 million, were roughly correlated with Asarco's comparative fault at the Site.

to prevent." (Judicial Estoppel Motion at 21-22.)

Applying the doctrine of judicial estoppel is appropriate given the circumstances described above. Noranda has presented a record that satisfies all three elements of the judicial doctrine, and so the court holds that Noranda is entitled to summary judgment on that basis.

**B.     As a matter of law, Asarco cannot establish that it paid more than its fair share of costs.**

To prevail on its contribution claim against Noranda, Asarco must establish that at least a portion of the $7.4 million it paid to the EPA was <u>more</u> than its fair share of cleanup costs at the Site and that Noranda is liable for that portion.[33]  But the record forecloses Asarco's ability to satisfy that burden.

First, the undisputed terms of the 2006 Noranda Consent Decree establish that Noranda has contribution protection for costs associated with the Tailings Impoundment.  Under that protection, Noranda is immune from Asarco's claim for costs incurred to clean up contamination at the Tailings Impoundment before March 1, 2006.[34]  <u>See</u> <u>Sun Co., Inc. (R&M) v. Browning-Ferris, Inc.</u>, 124 F.3d 1187, 1194 (10th Cir. 1997) ("[A]ny defendant PRP who has resolved its liability to the government in an administrative or judicially approved settlement may invoke the

---

[33]In its complaint, Asarco specifically asks for reimbursement of a portion of the $7.4 million it paid to the EPA.  Asarco does not ask for recovery of any other payment it may have made to a different entity for cleanup costs at the Site.

[34]Similarly, Asarco does not face any future liability for the Tailings Impoundment or the Lower Silver Creek Area.  When UPCM entered into the 2007 UPCM Consent Decree with the EPA, UPCM took responsibility for costs incurred after March 1, 2006, at the Tailings Impoundment.  When UPCM entered into the 2014 UPCM AOC with the EPA, UPCM assumed all responsibility to clean up the Lower Silver Creek Area.  If UPCM were to subsequently sue Asarco for some of the costs incurred during clean up of the Site, it would in all likelihood be unsuccessful because (a) UPCM has released Asarco from liability for Tailings Impoundment cleanup costs; and (b) Asarco received contribution protection for the entire Site from the EPA.

contribution defense contained in § 113(f)(2).").

Second, in Asarco's statements to the Bankruptcy Court, it admitted on the record that the $7.4 million was its fair share of the cleanup costs at the Site.[35]  As the court has already held, under the equitable judicial estoppel doctrine Asarco cannot change its position now.  And, as a matter of law, Asarco's statements in the bankruptcy court, whether treated as judicial admissions or as undisputed substantive evidence of its pro rata share, require the court to find for Noranda.

## <u>ORDER</u>

For the foregoing reasons, the court GRANTS Noranda's Motion for Summary Judgment Based on Judicial Estoppel Grounds and Asarco LLC's Judicial Admissions (Docket No. 132) and Noranda's Motion for Summary Judgment based on Failure to State a Claim, Contribution Protection, and Lack of Standing (Docket No. 134).

DATED this 31st day of March, 2016.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge

---

[35]It is telling that the EPA deposited $6 million of "ASARCO Settlement Funds" (the $7.4 million that Asarco paid to the EPA in the 2009 EPA-Asarco Settlement) for UPCM's use in cleaning up the Lower Silver Creek Area.  (See 2014 UPCM AOC Section IV.12 (defining "ASARCO Settlement Funds" as money "recovered by EPA from ASARCO, LLC pursuant to the [global settlement in 2009] <u>resolving</u> among other things <u>the liability of ASARCO, LLC</u> for the Site" (emphasis added).)