THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ASARCO, LLC, a Delaware limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>NORANDA MINING, INC., a Delaware corporation,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S [237] MOTION TO LIFT STAY**<br><br>Case No. 2:12-cv-00527-DBB<br><br>District Judge David Barlow |

The matter before the court is Plaintiff ASARCO, LLC's ("Asarco") Motion to Lift Stay.[1] The court previously granted Defendant Noranda Mining, Inc.'s ("Noranda") motion for a stay[2] on July 11, 2017.[3] After reviewing the briefing and relevant law, the court finds that oral argument is unnecessary.[4] For the reasons below, the court denies Asarco's motion.

## BACKGROUND

In the late nineteenth century, miners began to extract lead and silver ore from the mountains near Park City, Utah.[5] The act of processing the ore created waste "tailings."[6] The tailings washed down a nearby body of water—Silver Creek—ultimately resting in the Lower Silver Creek.[7] From 1925 to 1981, Asarco had an ownership interest in a mining site at Lower

---

[1] Mot. to Lift Stay, ECF No. 237, filed July 11, 2022.
[2] Mot. & Mem. in Support of Stay ("Mot. for Stay"), ECF No. 176, filed Feb. 2, 2017.
[3] Mem. Decision & Order Granting Mot. to Stay ("Granting Stay"), ECF No. 187, filed July 11, 2017.
[4] *See* DUCivR 7-1(g).
[5] Granting Stay 2.
[6] *Id.* "Mine tailings are fine grains of mining rock and water generated during the milling process as molybdenum is separated from the mined ore." *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1268 n.5 (10th Cir. 2017).
[7] Granting Stay 2.

Silver Creek.[8] Asarco also leased a site upstream from the Lower Silver Creek in 1970 to 1979 known as the Richardson Flat site.[9] From 1979 to 1982, Noranda was the lessee of the Richardson Flat site; it did not mine near the Lower Silver Creek.[10] After 1982, no further tailings were deposited at the Richardson Flat site.[11] The Lower Silver Creek site and Richardson Flat site are part of the greater Richardson Flat tailings impoundment area.

The EPA has divided the area into four operable units ("OU"). OU1 contains the bulk of the area's tailings and consists of the Richardson Flat site.[12] OU2 and OU3 include the Lower Silver Creek site. Tailings at this site include historic tailings piles and places where the Silver Creek deposited tailings from upstream sources.[13] The sites and OUs are depicted below.[14]



[8] *Id.* at 3.
[9] *Id.*
[10] *Id.*; Mot. for Stay 5.
[11] Expert Opinion of Mark P. Hemingway ("Hemingway Report") 10, ECF No. 237-5, filed July 11, 2022.
[12] *Id.* at 5.
[13] *Id.* at 5–6.
[14] Mot. for Stay 5; Expert Opinion of Susan T. Litherland ("Litherland Report") 15, ECF No. 237-2, filed July 11, 2022.

2



**Liability of the United Park City Mines Company**

The EPA began studying the Richardson Flat area in the 1980s pursuant to the

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[15]

Congress enacted CERCLA to address threats to health and the environment.[16] For purposes of

CERCLA, the EPA acts as the lead federal agency.[17]

---

[15] Granting Stay 3.
[16] *See Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1181 (10th Cir. 1999).
[17] *See* 42 U.S.C. § 9604.

United Park City Mines Company ("United Park") owns portions of the Richardson Flat site.[18] Through a judicial consent decree with the EPA, United Park assumed responsibility for the cleanup of the Richardson Flat site in exchange for the ability to draw from an EPA account that would be funded by potentially responsible parties ("PRP").[19] In consequence, the EPA sent letters to two PRPs, Noranda and Asarco, about liability for the Richardson Flat site and sought reimbursement.[20] In August 2005, Asarco filed for bankruptcy.[21] Noranda settled its liability to the EPA for the Richardson Flat site in March 2006.[22] The settlement, however, did not address the Lower Silver Creek site.[23] After the EPA selected a remediation plan for the Richardson Flat site in 2005, United Park finished cleanup at the site.[24]

In 2009, the EPA expanded its cleanup efforts to the Lower Silver Creek site.[25] United Park took responsibility for cleaning up this site and entered into an agreement with the EPA in 2014.[26] In exchange for its efforts, the EPA let United Park seek reimbursement from an account funded with money from Asarco's 2009 bankruptcy settlement, which is described below.[27] Pursuant to its agreement, United Park could seek reimbursement only when the EPA approves a cleanup plan for the Lower Silver Creek site.[28]

---

[18] Granting Stay 3.
[19] *Id.*; *see* Record of Decision, ECF No. 176-4.
[20] Granting Stay 3.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Mot. for Stay 6; Asarco's Quarterly Status Report for Fall 2022, ECF No. 253, filed Oct. 11, 2022.
[25] Granting Stay 4.
[26] *Id.*
[27] *Id.*
[28] *Id.* at 3–4; *see* Ex. 4, United Park Consent Decree 17–19, ECF No. 176-5, filed Feb. 1, 2017.

As a preliminary step to determining the cleanup costs for the Lower Silver Creek site, United Park needed to submit an Engineering Evaluation and Cost Analysis ("EE/CA").[29] The EPA took over responsibility for the EE/CA and all other required cleanup steps in 2017 because United Park failed to meet its obligations.[30] The United States brought suit against United Park in March 2019 to enforce the settlement agreement.[31] In October 2022, the court entered a consent decree that resolved all claims between the United States and United Park.[32]

**Typical CERCLA Contribution Action**

In a traditional CERCLA contribution case, the EPA first completes "a Remedial Investigation/Feasibility Study . . . to develop various options for cleanup and to determine the scope of remedial action" after identifying a site as hazardous.[33] Then, the EPA "conducts a detailed investigation at the site, seeking information regarding all site operations, and the extent of contamination at the site."[34] It also "prepares a Record of Decision ("ROD") describing the remedial action it selected and the action's anticipated costs."[35] The ROD is issued after a public comment period.[36] Finally, the EPA can bring a CERCLA action against PRPs if the EPA "has incurred costs or determined that an imminent release of hazardous contaminants would initiate a

---

[29] Admin. Settlement Agreement ("Admin. Agreement") 1, Mar. 7, 2014, ECF No. 176-9, filed Feb. 1, 2017. "At sites requiring removal action, the National Contingency Plan provides for the lead agency to conduct an [EE/CA], the purpose of which is to provide an analysis of response alternatives similar to that contained in a [Remedial Investigation/Feasibility Study]." 2 Law of Environmental Protection § 14:116 (Envtl. Law Inst. 2022).
[30] ECF No. 211.
[31] Compl., ECF No. 1, *United States v. United Park City Mines Co.*, No. 2:19-cv-200 (D. Utah 2022).
[32] *See* Consent Judgment, ECF No. 318, *United Park City Mines*, No. 2:19-cv-200.
[33] *Asarco, LLC v. NL Indus., Inc.*, No. 11-00138-CV, 2013 WL 12177089, at *2 (W.D. Mo. Mar. 18, 2013).
[34] *Id.* (citation omitted).
[35] *Id.* (citation omitted).
[36] *Id.*

government response."[37] A PRP could then seek contribution from other PRPs pursuant to 42 U.S.C. § 9613(f)(1).[38] As explained below, this process did not happen here.

**Asarco's Bankruptcy and EPA Settlement**

Asarco filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of Texas in August 2005.[39] Asarco sought protection from over $3.6 billion in environmental claims related to fifty-two sites nationwide, including the Richardson Flat area.[40] In 2006, the EPA filed a Proof of Claim for roughly $607,000 in cleanup costs associated with the Richardson Flat site.[41] In 2008, after learning of Asarco's ownership history at the Lower Silver Creek site, the EPA filed a supplemental claim and sought to recover another $50 million.[42] The EPA settled its claims against Asarco in 2009 regarding the Richardson Flat area for $7.4 million.[43]

**Asarco's Contribution Action**

On June 5, 2012, Asarco filed its Complaint.[44] It sought contribution from Noranda for the portion of the environmental damage that Noranda had allegedly caused to the Richardson Flat area.[45] The court granted summary judgment to Noranda in March 2016 based on "judicial estoppel, Noranda's contribution protection, and Asarco's inability to establish that it paid more

---

[37] *Id.*

[38] *Id.*

[39] Granting Stay 4.

[40] *Id.*

[41] *Id.* at 5.

[42] *Id.*

[43] *Id.* As of July 2022, the amount has increased to $9,162,836.17 due to interest. ECF No. 239.

[44] Compl., ECF No. 2, filed June 5, 2012. Asarco filed its Amended Complaint on August 8, 2013. Am. Compl, ECF No. 58. After its settlement with the EPA, Asarco had to file a contribution action within three years or else its claim against Noranda would be time-barred. *See* 42 U.S.C. § 9613(g)(3).

[45] Am. Compl. ¶¶ 11–20, 21–31; *see* 42 U.S.C. § 9613(f) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.").

than its fair share of costs at the Site."[46] Asarco appealed.[47] The Tenth Circuit reversed, holding

that Asarco had raised a genuine issue of material fact as to the amount, if any, owed by Noranda

for cleanup costs related to the Richardson Flat area.[48] Noranda subsequently moved for a stay.[49]

The court granted the stay on July 11, 2017, remarking that the stay would be lifted "after the

EPA approves a remediation plan for the Lower Silver Creek site."[50] The court ordered the

parties to submit quarterly joint status reports in the interim.[51]

**EPA's Actions at the Lower Silver Creek Site**

Before determining the scope of remedial action at the Lower Silver Creek site, the EPA

must complete several steps. First, the EPA must create a Site Characterization Report, which in

turn will inform a Human Health Risk Assessment.[52] At the same time, the EPA must complete

an Ecological Risk Assessment.[53] These reports, along with other test data, will lead to an

EE/CA.[54] The EE/CA will outline cleanup options at the site and give an estimate of what each

option would cost.[55] The EPA plans to open the EE/CA for at least thirty days of public comment

and then publish an action memorandum.[56] The action memorandum will set forth the chosen

cleanup plan and detail the scope of removal actions, if any, required for the site.[57]

---

[46] Am. Order and Mem. Decision 2, ECF No. 159, filed Mar. 31, 2016.
[47] ECF No. 160.
[48] *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1211–12 (10th Cir. 2017).
[49] Mot. for Stay.
[50] Granting Stay 11.
[51] *Id.*
[52] Email from Amelia Piggott to Richard Angell, July 6, 2022 ("EPA Email"), ECF No. 246-17, filed Aug. 9, 2022.
[53] *Id.*
[54] *Id.*
[55] Mot. for Stay 7.
[56] EPA Email.
[57] Admin. Agreement 15.

The EPA's estimates to complete the EE/CA have changed over time. As of October 2017, the EPA anticipated that it would finish the EE/CA for the Lower Silver Creek site between 2018 and 2019.[58] Two years later, the EPA pushed back its estimate to the second half of 2020.[59] In July 2020, the EPA predicted partial completion of the EE/CA by March 2021.[60] The following spring, the EPA said that it hoped to have the assessment done by early 2022.[61] Most recently, the EPA projected that it likely would complete the EE/CA by Summer 2023.[62] In an August 2022 email to Noranda, the EPA said that they are "hoping [the EE/CA] will be done in a year, but since [the new site manager] is just coming on to the [Lower Silver Creek] Site, it may take extra time to come up to speed."[63]

Despite the shifting estimates, EPA has made progress. Starting in 2018, the EPA completed a summary characterization of surface water at the Lower Silver Creek site.[64] Also in 2018, the EPA finished the background chemical determination for the site.[65] In 2018, the EPA analyzed soil and groundwater samples, conducted fish surveys, evaluated the area for potential aquatic life, performed data mapping, and executed a site features survey.[66] The EPA conducted more sampling in 2021.[67] The next year, the EPA analyzed the data from the 2021 sampling.[68]

---

[58] Asarco's Status Report for October 11, 2017, ECF No. 189, filed Oct. 11, 2017.

[59] Asarco's Quarterly Status Report for Fall 2019, ECF No. 207, filed Oct. 11, 2019; Noranda's Quarterly Status Report for Fall 2019, ECF No. 206, filed Oct. 11, 2019.

[60] Asarco's Quarterly Status Report for Fall 2020, ECF No. 219, filed Oct. 12, 2020; Noranda's Quarterly Status Report for Fall 2020, ECF No. 220, filed Oct. 12, 2020.

[61] Noranda's Quarterly Status Report for Spring 2021, ECF No. 225, filed Apr. 12, 2021; Asarco's Quarterly Status Report for Fall 2021, ECF No. 230, filed Oct. 12, 2021.

[62] Noranda's Quarterly Status Report for Fall 2022, ECF No. 254, filed Oct. 11, 2022.

[63] EPA Email. The EPA also noted that the cleanup of the Lower Silver Creek site is a "non-time critical removal action" and as such, the EPA plans to open the proposed EE/CA to public comment for at least thirty days before finalizing an action memorandum. *Id.*

[64] Decl. of Richard J. Angell ¶ 2, ECF No. 246, filed Aug. 9, 2022.

[65] *Id.* ¶¶ 3–4.

[66] *Id.* ¶¶ 5–7.

[67] *Id.* ¶¶ 9–10.

[68] *Id.* ¶ 11.

**Motion to Lift the Stay**

On October 13, 2021, the court granted Asarco leave to file a motion to lift the stay.[69] Asarco filed the instant motion on July 11, 2022.[70] Noranda filed an opposition on August 9, 2022,[71] and Asarco replied on August 23, 2022.[72]

## STANDARD

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."[73] "When determining whether to lift an existing stay, courts typically apply the same standard that applies to determine whether to impose a stay in the first place."[74] Factors relevant to the court's decision are: "(1) whether the stay would promote judicial economy; (2) whether the stay would avoid confusion and inconsistent results; and (3) whether the stay would unduly prejudice the parties or create undue hardship."[75] A party "generally faces a difficult burden" to show that a stay is required.[76]

---

[69] ECF No. 232.

[70] Mot. to Lift Stay.

[71] Def. Opp'n to Mot. to Lift Stay ("Opp'n"), ECF No. 245, filed Aug. 9, 2022.

[72] ECF No. 252.

[73] *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *see Ellis-Hall Consultants, LLC v. Hoffmann*, No. 2:12-cv-00771, 2018 WL 11411834, at *1 (D. Utah Aug. 29, 2018) (Courts have "broad discretion to determine whether to grant a stay." (citing *Clinton v. Jones*, 520 U.S. 681, 706 (1997))).

[74] *DivX, LLC v. Netflix, Inc.*, No. CV 19-1602, 2022 WL 1208167, at *3 (C.D. Cal. Mar. 29, 2022) (citing *Baxter Healthcare Corp. v. Becton, Dickinson & Co.*, No. 3:17-cv-2186, 2021 WL 22553, at *2 (S.D. Cal. Jan. 4, 2021)).

[75] *Khan v. Merit Med. Sys., Inc.*, No. 2:21-cv-00337, 2021 WL 8269547, at *3 (D. Utah Oct. 25, 2021) (quoting *Dutcher v. Bold Films LP*, No. 2:15-cv-00110, 2018 WL 5849471, at *1 (D. Utah Nov. 8, 2018)).

[76] *Classic Aviation Holdings LLC v. Harrower*, No. 2:20-cv-00824, 2021 WL 633587, at *2 (D. Utah Feb. 18, 2021) (quoting *White Knuckle, IP, LLC v. Elec. Arts Inc.*, No. 1:15-cv-00036, 2015 WL 5022579, at *1 (D. Utah Aug. 24, 2015)); *see id.* ("Because 'the right to proceed in court should not be denied except under the most extreme circumstances,' the movant seeking a stay 'must make a strong showing of necessity[.]'" (quoting *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983))).

## DISCUSSION

In its 2017 order, the court reasoned that a stay would "[p]romote judicial economy because the EPA, not the court, is the proper agency to assess the correct cleanup plan;" "[a]void confusion and potentially inconsistent results if the EPA select[ed] a different cleanup plan than the one determined by the experts;" and "[c]ause minimal prejudice or undue hardship."[77] The court decreed that the stay would be lifted after the EPA approved a remediation plan for the Lower Silver Creek site.[78] The EPA has not yet done so. After five years, Asarco now moves the court to lift the stay. For the reasons below, the stay will remain in place.

### I.   The Court Should Not Lift the Stay at This Time.

The court's 2017 order reasoned that whether Asarco had "paid more than its fair share" depended on the EPA's final cleanup plan.[79] The court concluded that the EPA must approve a cleanup plan before it could accurately allocate fault. Asarco, however, asserts that one does not need to consider future remediation to make a prima facie case for a CERCLA contribution claim.[80] Further, Asarco argues that all experts agree that the EPA's remediation plan is "irrelevant to an equitable apportionment of fault for environmental damage at the Site."[81] Asarco makes two related arguments. First, it contends that the claim against Noranda is justiciable even with unknown costs because the court can issue a declaratory judgment for Asarco's and Noranda's proportional liability.[82] Second, it dismisses as speculative Noranda's concern that the remediation plan may be inconsistent with the National Contingency Plan

---

[77] Granting Stay 11.
[78] Id.
[79] See id. at 7–11.
[80] Mot. to Lift Stay 11–12.
[81] Id. at 15.
[82] Id. at 17–18.

10

("NCP") because there is purportedly a presumption that the cleanup actions are consistent with the NCP.[83]

For its part, Noranda argues that until the EPA approves a remediation plan, Asarco cannot establish two essential elements. First, Asarco must prove that funds spent on cleanup are consistent with the NCP because the court cannot "simply assume [so] . . . , given [that] the EPA has not finalized a cleanup plan."[84] In fact, Noranda states that should the court lift the stay, it may catalyze motions to limit discovery to funds that have already been spent on cleanup.[85] Second, Noranda contends that the court must wait until the EPA publishes a definitive cleanup plan to accurately determine whether Asarco has "paid more than its fair share."[86] According to Noranda, the percentage attributable to Asarco and others depend on the total cost of cleanup, especially given the issue of potential orphan shares.[87] "'Orphan shares' are those shares of the waste responsibility which are attributable to PRPs who either are insolvent or cannot be located or identified."[88] Noranda contends that without a final cleanup plan, "it is impossible to determine whether Asarco's liability requires apportionment of any orphan share attributable to [United Park]'s historical mining operations."[89]

---

[83] *Id.* at 18–19. "To establish a prima facie case of liability, the plaintiff must show that . . . the plaintiff's response was consistent with the NCP." *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC*, 28 F.4th 996, 1013 (10th Cir. 2022) (citing *Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1136 (10th Cir. 2002)).

[84] Opp'n 9.

[85] *Id.* at 10.

[86] *Id.*

[87] *Id.* at 10–11.

[88] *Sun Co. (R&M) v. Browning-Ferris, Inc.*, 124 F.3d 1187, 1193 n.4 (10th Cir. 1997) (citing *Pinal Creek Grp. v. Newmont Min. Corp.*, 118 F.3d 1298, 1303 (9th Cir. 1997), *overruled on other grounds by Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 933 (9th Cir. 2008)).

[89] Opp'n 11.

Some courts have found that "a government approved remediation plan is not a prerequisite for the court's entry of an order of percentage liability allocation."[90] As such, a court could issue a declaratory judgment before the EPA issued a remediation plan by allocating liability for future response costs "at a set percentage across responsible parties."[91] In the same vein, a court could choose to stay a CERCLA contribution action until the EPA determined the remediation plan.[92] Asarco argues that this court should emulate other courts, which have allocated liability before the EPA finalized remediation plans.[93] However, the decision of whether to lift the stay is heavily fact-dependent. Here, the facts counsel a continued stay.

First, the EPA's EE/CA and action memorandum will better inform the court's liability apportionment decision. The EE/CA will be major step toward the EPA's remediation plan for the Lower Silver Creek site and will educate the court as to several equitable factors: the amount of hazardous waste, the degree of toxicity, and consequently the parties' degree of involvement and degree of care relative to the waste.[94] In particular, the court will be able to accurately determine liability for PRPs because the EPA's findings will illuminate the quantity and extent of environmental damage. This data might lead to liability against previously unknown

---

[90] *Columbia Falls Aluminum Co. v. Atl. Richfield Co.*, No. CV 18-131, 2020 WL 4382481, at *3 (D. Mont. July 31, 2020) (quoting *Dent v. Beazer Materials & Servs., Inc.*, 993 F. Supp. 923, 949 (D.S.C. 1995)); *see MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 235 (2d Cir. 2020), *as amended* (Aug. 13, 2020).

[91] *ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 866 (9th Cir. 2020), *cert. dismissed sub nom. Atl. Richfield Co. v. Asarco LLC*, 141 S. Ct. 2843 (2021); *see United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 1004 (C.D. Cal. 2011) ("[I]t is not necessary to determine the nature and amount of future response costs prior to awarding a declaratory judgment."). "[A] CERCLA § 113 plaintiff is entitled to a declaratory judgment allocating responsibility for future costs if 'it establishes that hazardous substances were disposed of at the site, that plaintiff has incurred clean-up costs, and there is a basis for establishing future liability.'" *Asarco LLC v. Atl. Richfield Co.*, No. CV 12-53, 2021 WL 2134807, at *18 (D. Mont. May 26, 2021) (quoting *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121, 1140 (D. Or. 1996))).

[92] *See United Steelworkers of Am. v. Or. Steel Mills, Inc.*, 322 F.3d 1222, 1227 (10th Cir. 2003) (citing *Landis*, 299 U.S. at 254).

[93] *See* Mot. to Lift Stay 11–19.

[94] *Columbia Falls*, 2020 WL 4382481, at *3.

responsible parties.[95] Thus, the court should wait until the EPA finishes its investigation to avoid the possibility of having to reallocate liability. The EPA's reports will also help the court determine whether Asarco has paid its fair share.[96] Otherwise, Noranda may be liable initially for a significant percentage of site cleanup and then potentially stand relieved of that liability when the EPA concludes its studies.

Next, two expert reports referenced by Asarco support continuing the stay. Susan Litherland, a registered professional engineer, noted in her report that "the primary factor that should be used in Superfund-type cost allocations for remediation of the unit is . . . relative quantities."[97] But while the data allowed Ms. Litherland to employ a "quantities-based distribution" for OU1, she found that "[u]sing the quantities of tailings placed in the Richardson Flat tailings impoundment to allocate costs for OUs 2 and 3 . . . has no technical merit, since it has not been established that the majority of the materials being addressed in OUs 2 and 3 originated at the Richardson Flat [site]."[98] Given the data, Ms. Litherland opined that "[i]t is unknown whether there are other entities associated with upstream activities that should also be considered PRPs, for OUs 2 and 3."[99] She concluded that more work is required and that determining whether Asarco overpaid or underpaid depends "on the actual costs of the remedies

---

[95] *See* Litherland Report 6 ("It is unknown whether there are other entities associated with upstream activities that should also be considered PRPs, for OUs 2 and 3."). The court has an obligation to ensure that liability is allocated to all responsible parties. *See Browning-Ferris*, 124 F.3d at 1193.

[96] *See United States v. Colorado & E. R.R.*, 50 F.3d 1530, 1536 (10th Cir. 1995) (citing *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507–08 (6th Cir. 1989)).

[97] Litherland Report 4.

[98] *Id.* at 5.

[99] *Id.* at 6.

for OUs 2 and 3, who pays for what, and what other costs might be incurred prior to a final closure of the Site."[100]

Mark Hemingway, a board-certified environmental scientist, found "no evidence of contribution beyond *de micromis* levels by Noranda."[101] Thus, he concluded that "Noranda would not have contributed to the volume of tailings present in Silver Creek," and he would have allocated no liability to Noranda for the Lower Silver Creek site based on a volumetric allocation approach.[102] Mr. Hemingway also notes that there are possible adjustments to his approach that cannot be considered until the EPA decides its response action.[103]

Dr. Andy Davis is the only expert cited by Asarco whose proposed liability allocation does not depend on future findings. Because a "volumetric allocation is not possible at th[e] site due to the lack of records of individual contributions," Dr. Davis uses a time-weighted allocation based on how long each entity owned, leased, or was responsible for the site.[104] Yet a lack of information should signify that it is advantageous to wait for the EPA to finish its investigation. It would be inefficient for the court to proceed to summary trial to make a liability determination with limited data and have to redecide the issue after the EPA promulgates its EE/CA or remediation plan.

Finally, the court should maintain the stay given the lack of needed data. As the EPA recently explained, it is "currently working to characterize the nature and extent and fate and

---

[100] *Id.* at 8.
[101] *Id.* at 30. The volumetric allocation approach assigns liability to a party based on the relative volumes of tailings deposited at a given site. *Id.* at 3.
[102] Hemingway Report 28.
[103] *See id.* at 30–31.
[104] *Id.* at ES-i.

transport of contamination in lower Silver Creek."[105] In this vein, two district court cases from the Western and Eastern Districts of Missouri are instructive. In both cases, Asarco sought contribution from a PRP before the EPA had selected a final remedy. In the case from the Western District of Missouri, the court concluded that it could not determine whether Asarco had overpaid because "the EPA ha[d] not yet finished its investigation . . . and ha[d] not determined common liability for the area" to include environmental damage.[106] In the Eastern District of Missouri, the court granted a stay because it could not reliably determine whether Asarco had "paid more than its fair share" "without knowing what the final remedy for the . . . sites [were]."[107]

  The cases cited by Asarco are factually inapposite. In *Tosco Corp. v. Koch Industries, Inc.*, the Tenth Circuit affirmed the district court's apportionment of liability based on past conduct.[108] Yet the court noted that the pollution caused by various refineries was "commingled and cannot be separated" after "balancing the equities in light of the totality of the circumstances," that "there was greater infiltration of contaminants into soils" during one responsible party's operation, and that there was no evidence showing that the "amount of waste disposed to the environment was substantially different" during the relevant party's ownership.[109] In short, there was sufficient "[r]ecord evidence . . . to support each of these findings."[110] Here, the EPA has not yet published its Site Characterization Report, EE/CA, or action memorandum. These documents would provide the parties and the court with a more

---

[105] EPA Email.
[106] *NL Indus.*, 2013 WL 12177089, at *4.
[107] *Asarco, LLC v. NL Indus., Inc.*, No. 4:11-CV-00864, 2013 WL 943614, at *2 (E.D. Mo. Mar. 11, 2013).
[108] *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 894–95 (10th Cir. 2000).
[109] *Id.* at 894.
[110] *Id.* at 894–95.

accurate picture of environmental conditions at the Lower Silver Creek site and consequently

party liability. None of the other cases that Asarco cites are factually apposite because the courts

in those cases had the advantage of more information.[111]

In sum, the EPA has not yet fully studied the Lower Silver Creek site. Until the EPA

releases the EE/CA and remediation plan, the court and the parties' experts have incomplete (and

very likely inaccurate) data.[112] The court should thus defer to the EPA's expertise. In this case,

waiting for the EPA's remediation plan—particularly the EE/CA—will promote judicial

economy, avoid inconsistent results, and help the court make a more informed and accurate

determination of liability.[113]

## II.   The Stay Is Not Immoderate or Unlawful.

Asarco contends that the five-year stay has become "immoderate and hence unlawful"

because the EPA has made no significant progress in approving a remediation plan.[114] Asarco

further argues that the court's prediction that the EPA would soon promulgate a plan has not

materialized and thus the stay has "the impermissible 'legal effect of preventing [Asarco] from

---

[111] In *Dent v. Beazer Materials & Services, Inc.*, the court stated that "the major part of the investigation of the property . . . is complete," postponing the allocation of liability would have "the effect of delaying private party cleanups and [would] cause[] much damage to non-responsible parties," and a declaratory judgment would allow the parties to agree on a plan to remove the waste before EPA intervention. 993 F. Supp. at 948–49. Here, the EPA has several remaining steps before producing a cleanup plan, Asarco has not argued that the stay has prevented it from cleaning up the Lower Silver Creek site, and, in any event, the EPA has already intervened to spearhead the cleanup efforts. In *Columbia Falls*, the court concluded that the EPA's final report would not provide new information. 2020 WL 4382481, at *4. The court in *El Paso Natural Gas Co. v. United States* reasoned that it already had substantial information on the "nature and extent of contamination." 390 F. Supp. 3d 1025, 1054–55 (D. Ariz. 2019). In *Asarco, LLC v. Union Pacific Railroad Co.*, the court could reference the ROD, the ROD amendment, and cleanup plan to allocate liability. *See* No. 2:12-cv-00283, 2018 WL 3599967, at *7 (D. Idaho July 26, 2018). Finally, the court noted that the parties agreed in *Atlantic Richfield Co.* that the "administrative process ha[d] progressed." 2021 WL 2134807, at *3. Namely, the court found that the pollution had "been carefully studied . . . ." *Id.* at *4, 20.
[112] *See* Davis Report; Litherland Report; Hemingway Report.
[113] As such, the court need not discuss the matter of whether Asarco must show that future response costs are "necessary and consistent with the NCP." Mot. to Lift Stay 18.
[114] *Id.* at 9 (quoting *Landis*, 299 U.S. at 257).

16

proceeding with its claim in federal court for an indefinite period of time, potentially for years.'"[115]

In response, Noranda contends that the court can maintain a stay "as long as it identifies 'a pressing need' for the stay and 'then balance[s the] interests favoring a stay against interest[s] frustrated by the action.'"[116] Noranda argues that the stay is necessary to preserve judicial resources and to prevent confusion and inconsistent results should the EPA use a cleanup plan different from the one proposed by experts.[117] Also, Noranda distinguishes this case's procedurally unusual posture from CERCLA cases cited by Asarco.[118] Finally, Noranda contends that it is reasonable for the court to maintain the stay because the EPA has made progress in the remediation plan and the court should defer to the agency's expertise.[119]

"The scope of a stay and the reasons for its issuance determine whether a stay is immoderate."[120] Generally, a "stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits."[121] In other words, a stay could "prove[] to be 'immoderate'" over time if the reasons for the stay have expired.[122] Even if the

---

[115] *Id.* at 10 (quoting *Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012)).

[116] Opp'n 7–8 (quoting *Cherokee Nation of Okla. v. United States*, 124 F.3d 1413, 1416 (Fed. Cir. 1997)).

[117] *Id.* at 7.

[118] "None of the cases Asarco cites for this proposition have the same 'unique' procedural posture as this case." *Id.* at 12.

[119] *Id.*

[120] *Belize Social Dev.*, 668 F.3d at 732.

[121] *Priv. Med. Care Found., Inc. v. Califano*, 451 F. Supp. 450, 452 (W.D. Okla. 1977) (quoting *Landis*, 299 U.S. at 257); *see Cherokee Nation*, 124 F.3d at 1416 ("A stay so extensive that it is 'immoderate or indefinite' may be an abuse of discretion." (quoting *Landis*, 299 U.S. at 257)).

[122] *Lisa, S.A. v. Moyorga*, 149 F. App'x 901, 903 (11th Cir. 2005) (unpublished). As the Supreme Court explained in *Landis*, "once those [reasonable] limits have been reached, the fetters should fall off." 299 U.S. at 257; *see Gouger v. Citibank NA*, No. 19-02434, 2020 WL 1320723, at *3 ("Stays must be kept within the 'bounds of moderation' and should not have an infinite duration." (quoting *Landis*, 299 U.S. at 255–56)).

stay is indefinite, the court can show a "'pressing need' for the stay . . . and . . . 'balance [the] interests favoring a stay' against opposing interests."[123]

A perceived immediacy to the EPA's remediation plan was not the court's primary reason for imposing the stay. The court's "dispositive inquiry [wa]s whether the issuance of a[n action memorandum] w[ould] shed necessary light on the parties' respective contribution obligations."[124] As the court stated, "[f]orecasting allocation of liability before a formal ROD may turn out to be inaccurate and a waste of resources."[125] As a result, the court ordered a stay until the EPA completed its studies and created a remediation plan. The need for the EPA to provide more information has not vanished simply because five years has elapsed.[126] Part of the delay is also attributable to the COVID-19 pandemic, something which was unforeseen.[127] Continuing the stay here will prevent an inaccurate decision as to the liability apportionment, help avoid piecemeal litigation, and provide needed development of the record by EPA. For these reasons, the stay is not immoderate or unlawful.

**III.   Equitable Factors Favor a Continued Stay.**

The court's decision is guided by a weighing of "competing interests and . . . the effects of the stay on the Court's docket, on counsel, and on the litigants."[128] Factors relevant to the court's decision whether to impose a stay are: "(1) whether the stay would promote judicial

---

[123] *Groves v. McDonough*, 34 F.4th 1074, 1080 (Fed. Cir. 2022) (quoting *Cherokee Nation*, 124 F.3d at 1416); *see Landis*, 299 U.S. at 255 (A court could abuse its discretion by ordering "a stay of indefinite duration in the absence of a pressing need.").

[124] *Columbia Falls*, 2020 WL 4382481, at *3.

[125] Granting Stay 10.

[126] *See MTGLQ Investors, LP v. Wellington*, No. 17-CV-487, 2022 WL 78901, at *2 (D.N.M. Jan. 7, 2022) (terminating the stay because the reason for its issuance—the pendency of an appeal—had become moot).

[127] *See* Email from Amelia Piggott to Richard Angell, Aug. 3, 2022, ECF No. 246-2, filed Aug. 9, 2022.

[128] *Hoffmann*, 2018 WL 11411834, at *1 (quoting *Utah v. Eli Lily & Co.*, 509 F. Supp. 2d 1016, 1019 (D. Utah 2007)).

economy; (2) whether the stay would avoid confusion and inconsistent results; and (3) whether the stay would unduly prejudice the parties or create undue hardship."[129] "Ultimately, a court must exercise its own judgment to 'weigh competing interests and maintain an even balance among those fulfilled by a stay and those frustrated by such action.'"[130] As explained below, the court finds that the balance of factors weigh in favor of maintaining the stay.

### A.  The Stay Will Promote Judicial Economy and Help Avoid Confusion and Inconsistent Results.

The court previously reasoned that the stay would promote judicial economy and that a stay was necessary to avoid confusion and potentially inconsistent results.[131] The court reaches the same conclusions today. The EPA's EE/CA will reveal more about the nature and extent of pollution at the Lower Silver Creek site, which will be relevant factors in the court's liability determination.[132] Currently, the experts lack necessary data. Should the court proceed to summary trial before the EPA completes its investigation, there is the potential for duplicative efforts if the data changes the liability analysis, whether by revealing additional PRPs or changing the balance between Asarco and Noranda. The finished data could also make the existing experts' opinions moot or at least change how they are evaluated. Maintaining the stay until the EPA provides the needed materials also will prevent the parties from having to prepare another set of expert opinions. In short, the court lacks key information that would help it make an accurate decision. Waiting to lift the stay at this time not only will save the parties and the court wasted time and resources, but it also will promote an informed and correct decision.

---

[129] *Khan*, 2021 WL 8269547, at *3 (quoting *Dutcher*, 2018 WL 5849471, at *1).

[130] *Wellington*, 2022 WL 78901, at *2 (quoting *Topsnik v. United States*, 114 Fed. Cl. 1, 4 (2013)).

[131] Granting Stay 11.

[132] Once the EPA completes the EE/CA for the Lower Silver Creek site, the court will be open to additional argument as to whether the document provides sufficient information for the court to proceed to trial.

### B.  The Stay Will Cause Minimal Prejudice and Lead to No Undue Hardship.

In its order granting the stay, the court explained that a stay would cause minimal prejudice and no undue hardship.[133] Neither party has convinced the court otherwise. The party moving for a stay must "make out a clear case of hardship or inequity in being required to go forward" only if "there is . . . a fair possibility that the stay . . . will work damage to some one [sic] else."[134] For the reasons previously stated, Noranda has done so. Asarco, however, has not persuasively explained how it would be prejudiced should the court continue the stay. It contends that it has a statutory right to proceed with a contribution action under 42 U.S.C. § 9613(f), a stay impermissibly allows Noranda the opportunity to settle with the EPA, and the stay causes a denial of due process.[135]

The court finds Asarco's arguments unpersuasive on this record. First, it is true that CERCLA grants Asarco the right to pursue a contribution action against Noranda.[136] Contrary to Asarco's claims, the court has not "nullif[ied] [Asarco's] rights of contribution,"[137] nor has it "prohibit[ed] Asarco from exercising its . . . right to seek contribution."[138] Indeed, the stay has not barred Asarco from seeking contribution. The court has merely delayed the case until the parties can efficiently litigate their claims so that the court can accurately determine liability.

Second, Asarco offers no evidence that Noranda is seeking to settle with the EPA for liability at the Lower Silver Creek site or that Noranda has initiated another action. On that basis,

---

[133] Granting Stay 11.
[134] *Landis*, 299 U.S. at 255.
[135] Mot. for Stay 4–6.
[136] *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 138 (2007) (citing 42 U.S.C. § 9613(f)(1)).
[137] *Solutia, Inc. v. McWane, Inc.*, 726 F. Supp. 2d 1316, 1325 (N.D. Ala. 2010).
[138] Asarco Resp. in Opp'n to Noranda's Mot. in Support of Stay ("Opp'n to Stay") 3, ECF No. 182, filed Feb. 15, 2017.

the court has not "compelled [Asarco] to stand aside while [Noranda] . . . settles the rule of law that will define the rights of both."[139] The court will settle Asarco's contribution claim against Noranda once it lifts the stay.

Finally, the court has not denied Asarco due process. Unlike a situation where a court has "stripped [a prisoner] of free access to the courts and the use of legal process to remedy civil wrongs[,]" Asarco has already brought its contribution action before the court.[140] Simply put, Asarco has not identified any case law to support the proposition that a stay in a CERCLA contribution case is "tantamount to the denial of due process."[141] The instant stay has therefore not "render[ed] the legal process meaningless for [Asarco]."[142]

Additionally, the court's postponement of a liability determination does not cause Asarco undue hardship. A declaratory judgment would not immediately result in a monetary award. Asarco has already declared bankruptcy and settled with the EPA for its liability at the Lower Silver Creek site for a fixed sum.[143] Should the court declare that Asarco was responsible for just a portion of future cleanup costs, Asarco would still have to wait for the determination of actual remediation costs before obtaining contribution from Noranda. Thus, waiting for EPA to do its work does not represent a significant hardship for Asarco, at least not on this record, especially given this case's unique procedural posture.[144]

---

[139] *Landis*, 299 U.S. at 255.

[140] *Wimberly v. Rogers*, 557 F.2d 671, 673 (9th Cir. 1977).

[141] Opp'n to Stay 6.

[142] *Peterson v. Nadler*, 452 F.2d 754, 756 (8th Cir. 1971), *abrogated by Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296 (1989).

[143] Granting Stay 5.

[144] *See id.* at 5–7 (describing this case's atypical CERCLA contribution action where, due to its bankruptcy, Asarco sought contribution from other PRPs before the EPA completed the ROD).

On the other hand, lifting the stay before the EPA does its work would prejudice Noranda and make an inaccurate judicial determination quite likely. Asarco's contribution action is procedurally unusual.[145] Instead of waiting until the EPA determined the amount of pollution and what parties are responsible, Asarco settled with the EPA due to its bankruptcy. Asarco now seeks contribution from Noranda for anticipated response actions in the future. Under the law, Asarco was permitted to seek the protection of bankruptcy, but it then faced a statute of limitations for filing a contribution claim, so it filed its claim long before EPA, the subject-matter expert, had done the work that would allow the parties and the court the benefit of an accurate fact record. Asarco's actions alone baked in the likelihood that this action would take years longer than usual. Then the party who had assumed responsibility for the cleanup, United Park, failed, adding years more. And, of course, COVID-19 has delayed nearly everything and everyone, including EPA, occasioning further delay.

This case is not truly like any other cited by the parties and must be decided on its own unique combination of facts. For these reasons, the balance of equitable factors tilts in favor of continuing the stay.

## ORDER

Accordingly, the court DENIES Plaintiff's Motion to Lift Stay.[146] The parties shall continue to submit quarterly status reports. When the EPA approves a remediation plan,[147] the parties shall submit a status report within fourteen days and file a motion to lift the stay.

---

[145] See NL Indus., 2013 WL 12177089, at *4 ("Asarco's . . . settlement does not result from the conventional CERCLA process for contribution actions."); NL Indus., 2013 WL 943614, at *2 ("This is not, therefore, a case of a voluntary payment by a PRP.").
[146] ECF No. 237.
[147] After EPA completes its EE/CA, if Asarco believes that the information contained therein is sufficient to address the problems identified in this order, it may again seek a lifting of the stay.

Concurrent with the motion to lift the stay, the parties shall file a proposed schedule for resolution of claims remaining in this case with an attorneys' planning meeting report and a proposed scheduling order.

       Signed November 22, 2022.

                BY THE COURT

                _____

                David Barlow
                United States District Judge